STATE of Missouri, Respondent,

v.

Dennis J. SKILLICORN, Appellant.

No. 78864.

Supreme Court of Missouri,
En Banc.

April 29, 1997.

As Modified on Denial of Rehearing
May 27, 1997.

Elizabeth Unger Carlyle, Lee's Summit, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for Respondent.

PRICE, Judge.

A jury convicted Dennis Skillicorn of first degree murder pursuant to Section 565.020, RSMo 1994,[1] for his part in the murder of Richard Drummond on August 24, 1994. The trial court imposed a sentence of death. We have exclusive jurisdiction over the appeal. *Mo. Const. art.* V, Section 3. The judgment is affirmed.

## I. Facts

In late August, 1994, Dennis Skillicorn, Allen Nicklasson, and Tim DeGraffenreid headed east from Kansas City to obtain illegal drugs. On August 23, 1994, during their return trip to Kansas City, the 1983 Chevrolet Caprice in which they were traveling broke down twenty-two miles east of the Kingdom City exit on I–70. An offer of assistance by a state trooper was refused. The following day, the trio had progressed only 17 miles to the JJ overpass approximately 5 miles east of Kingdom City. They burglarized the nearby home of Merlin Smith, stole some guns and money, and used the stolen money to pay for a tow to Kingdom City. A garage in Kingdom City was unable to repair the Caprice's extensive mechanical problems.

The trio then drove the car back east toward the site of their earlier robbery. They stalled again on the south outer road east of Kingdom City. Between 4 and 5 p.m., Richard Drummond, a technical support supervisor for AT & T, saw the stranded motorists, stopped, and offered to take them to use a phone. He was driving a white, 1994 Dodge Intrepid, company car.

Skillicorn and Nicklasson were both armed. They loaded the booty from the Smith burglary into the trunk of Drummond's car. While Nicklasson held a gun to Drummond's head, Skillicorn asked Drummond questions in order to calm him down, including whether Drummond's "old lady" was going to miss him. As Drummond drove east, Skillicorn "got to thinking ... if we let this guy off, he's got this car phone." So they disabled the car phone. Skillicorn stated that he later determined they would have to "lose" Drummond in the woods. At some point during this time, Nicklasson and Skillicorn discussed what they should do with Drummond. Skillicorn, in his sworn statement, claimed that Nicklasson said "he was going to, you know, do something to this guy. I tell him—you know, now, we're trying to talk on the pretenses that—that, uh, this guy in the front seat don't hear us too. Right?

---

1. The statute provides:
 1. A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter.
 2. Murder in the first degree is a class A felony, and the punishment shall be either death or imprisonment for life without eligibility for probation or parole, or release except by act of the governor; except that, if a person has not reached his sixteenth birthday at the time of the commission of the crime, the punishment shall be imprisonment for life without eligibility for probation or parole, or release except by act of the governor.

Right. 'Cause, uh, I didn't want him panicking."

They directed Drummond to exit I–70 at the Highway T exit just east of Higginsville. They proceeded four miles onto County Road 202 to a secluded area where they ordered Drummond to stop his vehicle. As Nicklasson prepared to take Drummond through a field toward a wooded area, Skillicorn demanded Drummond's wallet. Knowing Nicklasson had no rope or other means by which to restrain Mr. Drummond and that Nicklasson carried a loaded .22 caliber pistol, Skillicorn watched as Nicklasson lead Mr. Drummond toward a wooded area. There, Nicklasson shot Mr. Drummond twice in the head. Skillicorn acknowledged hearing two shots from the woods and that Nicklasson returned having "already done what he had to do." Drummond's remains were found eight days later.

## II.

### A. Issues on Appeal

On appeal, Skillicorn alleges the following twenty-two points of trial court error: 1) the court erred by excluding as hearsay a statement by Nicklasson in the guilt-innocence phase because the statement was a declaration against Nicklasson's penal interest; 2) the court erred by excluding the testimony of Skillicorn's expert witness; 3) the court erred in overruling the motions for judgment of acquittal because the evidence was insufficient to show the required element of deliberation by Skillicorn; 4) the court erred in refusing to order the disclosure of the mental health records of Nicklasson to the defense because they contained information material to Skillicorn's defense and such denial violated Skillicorn's right to due process of law, compulsory process, to present defensive evidence, and to be free from cruel and unusual punishment; 5) the court erred in refusing to give Skillicorn's requested instruction A because the instruction actually given failed to require the jury to find that Skillicorn deliberated upon Drummond's murder; 6) the court erred in refusing to give Skillicorn's requested converse instruction B because the instruction actually given failed to negative deliberation; 7) the court erred in admitting evidence of subsequent offenses of appellant because such evidence was not relevant to any material issue and its prejudicial impact outweighed its probative value; 8) the court erred in giving instruction 5 concerning evidence of "other offenses" in that the instruction failed to specify only those purposes for which the evidence was admissible; 9) the court erred in admitting the crime scene videotape of Drummond's partially decomposed body in that its probative value was outweighed by its prejudicial impact; 10) the court erred in admitting still photographs of Drummond's decomposing corpse because the photographs' probative value was outweighed by their prejudicial impact; 11) the court erred in restricting the voir dire examination of venireperson Heitmeyer because Skillicorn was denied his right to make for cause and peremptory challenges intelligently; 12) the court abused its discretion in failing to provide the jury with defense exhibit T–18A immediately upon its request; 13) the court erred in admitting evidence of Skillicorn's statement because the statement was obtained in violation of his Fifth Amendment rights; 14) the court erred in excluding portions of appellant's statement offered by the defense, because the excerpts were admissible under the rule of completeness; 15) the court erred in permitting the medical examiner to testify, over Skillicorn's objection, that Drummond would have died of dehydration if tied for eight days because such testimony was irrelevant, speculative, and prejudicial; 16) the court erred in permitting FBI Agent McOmber to testify that persons giving statements often minimize their involvement in the offense because such testimony was not a proper subject for expert opinion; 17) the court erred in denying Skillicorn's motion to prohibit death-qualification of the jury because death-qualification violated Skillicorn's right to a fair trial and to be free from cruel and unusual punishment and prospective jurors' rights to equal protection of the law; 18) the court erred in admitting the two postcards sent to Annie Wyatt because their prejudicial effect outweighed their probative value; 19) the court erred in denying appellant's motion for a continuance of the hearing on his motion for a new trial and sentencing so that he could

procure Nicklasson's testimony because such ruling denied Skillicorn his right to present defensive evidence and to be free from cruel and unusual punishment; 20) the court erred in overruling Skillicorn's challenges for cause to prospective jurors Huddleston, DeMasters, Homan, and Akridge because they indicated they were biased in favor of the death penalty and their inclusion in the jury panel subjected Skillicorn to cruel and unusual punishment and denied him a fair trial; 21) the death sentence in this case is unconstitutional and must be vacated because Section 565.035.3(3), RSMo, and Missouri's case law provide no guidance on proportionality review, and such violates Skillicorn's right to effective assistance of counsel and due process of law; 22) the death sentence is disproportionate to that imposed in other similar cases.

For convenience, we will consider these points in the order they arose at trial.

### B. Standard of Review

■■■ On direct appeal, we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996), *cert. denied*, —— U.S.——, 117 S.Ct. 307, 136 L.Ed.2d 224 (quoting *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990)). We review the facts in the light most favorable to the verdict. *State v. Shurn*, 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). "To prevail on plain error review, [the defendant] must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice results if the error is not corrected." *State v. Parker*, 886 S.W.2d 908, 917 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

### III. Disclosure and Suppression Issues

### A. Nicklasson's Statement

Skillicorn first contends that a statement made by Nicklasson to FBI Special Agent Arthur McOmber was improperly excluded as hearsay. He argues that the statement was admissible as an admission against Nicklasson's penal interest. Agent McOmber testified at a pretrial hearing that Nicklasson told him:

They got out of the car. They walked—Mr. Nicklasson walked with Mr. Drummond at gunpoint off into an area. Mr. Nicklasson stated he initially was intending to tie Mr. Drummond up and take his car and leave him out there in the area tied up. As he walked, he said he, quote, snapped, that he was so angry at the entire situation. He said something inside of him told him to do it, do it, and he was worried about that feeling that he was getting. So he kept trying to change the subject, kept trying to change his thoughts, and he talked to Mr. Drummond about his military service. They continued walking.

Eventually Mr. Nicklasson told Mr. Drummond to kneel down. And one of the things that Mr. Nicklasson explained that made him so frustrated or mad is that Mr. Drummond was so submissive, that he never made any gesture whatsoever to try and flee or run away or even talk his way out of the situation, and Mr. Nicklasson stated that had Mr. Drummond done any of those things that maybe he might not have shot him or killed him, that maybe he would have left him there.

■■■ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and which depends upon the veracity of the statement for its value." *State v. Sutherland*, 939 S.W.2d 373 (Mo. banc 1997). Such statements are generally inadmissible unless they fall within a recognized exception to the hearsay rule. *Id.* Before *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), Missouri courts held that declarations made by an unavailable witness against that witness's penal interest were not admissible as exceptions to the hearsay rule in criminal proceedings. *State v. Blankenship*, 830 S.W.2d 1, 6–7 (Mo. banc 1992). *Chambers*, however, recognized a constitutional right to proffer statements that would exonerate the

defendant and "were originally made and subsequently offered at trial under circumstances that provided *considerable assurance of their reliability.*" 410 U.S. at 300, 93 S.Ct. at 1048 (emphasis added). The *Chambers'* court set forth the following tests of reliability: "(1) each confession was 'in a very real sense self-incriminatory and unquestionably against interest;' (2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred; and (3) the statements were corroborated by other evidence." *State v. Smulls*, 935 S.W.2d 9, 21 (Mo. banc 1996) (citations omitted).

■ The indicators of reliability delineated in *Chambers* are not present in this case. First, Nicklasson's statement was not "in a very real sense self-incriminatory and unquestionably against interest." Nicklasson's statement could merely be an attempt to exonerate himself of the requisite mental state for first degree murder. Second, the statement was neither spontaneous nor made to a close acquaintance shortly after the murder occurred. Instead, it was made to an FBI agent after the declarant had been arrested on October 5, 1994, nearly a month and a half after the murder. Finally, the statement was not corroborated by other evidence. Although Nicklasson claimed that he "was intending to tie Mr. Drummond up and take his car and leave him out there in the area tied up," Skillicorn testified that Nicklasson did not carry anything with which to bind Mr. Drummond. The only thing Nicklasson held as he lead Mr. Drummond off towards the woods was a .22 caliber pistol. Neither the circumstances surrounding the statement nor the statement itself create "considerable assurance of [its] reliability." Nicklasson's statement was properly excluded. Point One is denied.

### B. Nicklasson's Mental Health Records

Skillicorn next claims that the trial court erred by denying his request to examine the mental health "reports or statements" of his co-defendant, Allen Nicklasson. He argues this denial violated his rights under Rule 25, the Missouri Constitution, and the United States Constitution's Due Process Clause, Compulsory Process Clause, and Eighth Amendment. Skillicorn seeks, as remedy to the purported error, an *in camera* inspection of Nicklasson's mental health evaluations by the trial court or this Court to determine whether they contain evidence exculpating Skillicorn of the requisite mental state for first degree murder.

■ The state argues that the mental health evaluation of Nicklasson is protected by the physician-patient privilege created by section 491.060(5), RSMo 1994. Usually, if medical records are disclosed to a third party, the privilege is waived as to the whole world. *See State v. Lewis*, 735 S.W.2d 183, 187 (Mo.App.1987). However, here, it appears the evaluation was performed at the state's instance pursuant to chapter 552, RSMo. We need not address the relation between mental health evaluations performed pursuant to chapter 552 and section 491.060's physician-patient privilege. The record in this case indicates the trial court performed an *in camera* inspection of the documents at issue and found them irrelevant to Skillicorn's defense.[2] Skillicorn has already obtained the remedy he seeks. Point Four is denied.

### C. Video and Photographs of the Victim's Body

Skillicorn claims the trial court erred in admitting video footage, and photographs of Mr. Drummond's body in an advanced state of decomposition. Skillicorn contends that there was "no question as to Drummond's identity, the identity of the shooter, or the manner of death." He asserts the video and photographs possessed no probative value

---

2. The state noted during the hearing on this motion before the trial court:

> I think this Court has seen already the three evaluations regarding competency, has had a chance to review those, and we don't think it's relevant, but the Court had a chance to do an in camera inspection of those three documents.

The court did not refute this statement and subsequently quashed the subpoenas served on Nicklasson's counsel and denied Skillicorn's motion to compel disclosure of Nicklasson's mental health history or status.

and were admitted into evidence solely to arouse the emotions of the jurors.

■■■ The arguments posed by Skillicorn were considered and rejected in *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). There the Court stated:

> The trial court is vested with broad discretion in the admission of photographs. "Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." Photographs are also relevant when they depict the condition and location of the body. "[A] photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the state precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved."

*Id.* The same considerations pertain to video evidence. The court did not abuse its discretion in admitting Exhibits 18, 20, 21, 26, and V–1. Points Nine and Ten are denied.

### D. Postcards and Evidence of Subsequent Offenses

Skillicorn contends the trial court erred by admitting evidence of several crimes committed by Skillicorn and Nicklasson after Mr. Drummond's execution. After Nicklasson shot Mr. Drummond, Skillicorn, Nicklasson, and DeGraffenreid drove the stolen vehicle to a mutual friend's house in Blue Springs. Keri McEntee came to that house seeking DeGraffenreid. Upon her arrival, Skillicorn and Nicklasson came out of the house and Nicklasson accused McEntee of "messing" with "their" car. Both Skillicorn and Nicklasson obtained firearms from the trunk of Mr. Drummond's car and held them to McEntee's head. Nicklasson said he would not hesitate to kill her. The home owner then came out of his house, whereupon, Skillicorn and Nicklasson left. Skillicorn claims this evidence was improperly admitted because it was evidence of other crimes and

because the probative value of this evidence was outweighed by its prejudicial effect.

■■■ "Criminal defendants have the right to be tried only for the offense for which they are charged." *State v. Hornbuckle*, 769 S.W.2d 89, 96 (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). "To be admissible, proof of the commission of another crime or other crimes must have some legitimate tendency to prove that the accused committed the crime for which he is being tried." *State v. Buxton*, 324 Mo. 78, 22 S.W.2d 635, 636 (1929). "It is clearly not admissible on the theory that, if a person will commit one offense, he will commit another." *Id.*, 22 S.W.2d at 637. The evidence must also be "legally relevant, in that its probative value outweighs its prejudicial effect. The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993) (citations omitted).

This Court in *Buxton* noted some particular cases and scenarios in which evidence of other crimes helped to prove that the accused committed the crime for which he was charged, and was, therefore, admissible. In a 1938 opinion, this Court cited to *Buxton* stating that it had delineated five "recognized exceptions." *State v. Garrison*, 342 Mo. 453, 116 S.W.2d 23, 24 (1938). Those exceptions provide for the admission of evidence that tends to establish motive, intent, the absence of mistake or accident, or a common scheme or plan. *Id.* We have also permitted the admission of "other crimes" evidence to show the circumstances or the sequence of events surrounding the offense charged, *State v. Wacaser*, 794 S.W.2d 190, 194 (Mo. banc 1990); *State v. Flenoid*, 838 S.W.2d 462, 467 (Mo.Ct.App.1992); *State v. Davis*, 806 S.W.2d 441, 443 (Mo.Ct.App.1991), and to help present a complete and coherent picture

of the events that transpired. *Flenoid, supra,* at 467.

But these "recognized exceptions" were never meant to be an exclusive list within which evidence must necessarily fall in order to be admissible. *Bernard,* 849 S.W.2d at 13 ("evidence of misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible"). Rather, the test has always been whether the evidence has some "legitimate tendency to prove that the accused committed the crime for which he is being tried," *Buxton,* 22 S.W.2d at 636, and is more probative than prejudicial. *Bernard,* 849 S.W.2d at 13.[3]

■ To prove Skillicorn guilty of first degree murder in this case, the state was required to show that, with the purpose of promoting or furthering the death of Richard Drummond, the defendant aided or encouraged Allen Nicklasson in causing the death of Richard Drummond and did so after deliberation. *See* MAI–CR3d 304.04. At trial, Skillicorn disputed the element of deliberation in the murder of Mr. Drummond. Skillicorn contended that he believed Nicklasson was going to take Mr. Drummond into the woods and somehow restrain him there and that Nicklasson's murder of Mr. Drummond was a complete surprise to him.

The challenged evidence is a continuation of the sequence of events that presents a coherent picture of Skillicorn's crime. The events occurred only hours after Mr. Drummond's murder as Skillicorn and Nicklasson were making their escape west. Rather than an unrelated crime that might be used only to prejudice the jury, Skillicorn's participation in the threat to McEntee was particularly relevant and connected to the crime charged. It occurred only a few hours after the murder took place. Skillicorn and Nicklasson threatened McEntee's life with the same guns used in the perpetration of Mr. Drummond's murder. These actions were taken to protect the very object for which they had murdered Mr. Drummond, that is, his car.

The jury could also infer from this evidence Skillicorn's murderous mental state during the period surrounding the charged murder and that he had no intention of distancing himself from Nicklasson's actions. If Skillicorn had not deliberately become involved with Mr. Drummond's murder, under the circumstances of this case, he likely could have distanced himself from, not overtly worked as a team with, one he knew to be the murderer. This evidence helped establish Skillicorn's deliberation on Mr. Drummond's murder, and that he aided Nicklasson in perpetrating the murder, both elements of the crime charged. We expressly recognized the use of "other crimes" evidence that was strongly connected to the charged crime to support the element of deliberation in *State v. Kenley,* 693 S.W.2d 79, 81–82 (Mo.1985); *rev'd on other grounds,* 937 F.2d 1298 (8th Cir.1991) (ineffective assistance of counsel during the sentencing phase for failure to present proper expert mitigating evidence). We stated: "Mental state, in this case deliberation and premeditation, is rarely capable of direct proof, and that findings of deliberation and premeditation depend usually upon an inference reasonably drawn from the evidence and circumstances surrounding the act.... [The Defendant's] subsequent robberies and his statements that he had killed earlier and would kill again are also indicative of a deliberative state of mind.... Conduct before and after the commission of the charged crime is relevant where it relates to the elements of the charged crime." *Id.*

Such *mens rea* evidence is admissible particularly "where different inferences may fairly and reasonably be drawn regarding the intent with which the alleged criminal act was done or where the surrounding circumstances are such as to be susceptible of an interpretation indicating innocence." *State v. Shilkett,* 356 Mo. 1081, 204 S.W.2d 920, 923 (1947) (citing *State v. Bersch,* 276 Mo. 397, 207 S.W. 809 (1918) (where the evidence tending to show arson was entirely circumstantial and the fire was susceptible of explanation as accidental); *State v. Fischer,* 297 Mo. 164, 249 S.W. 46, 49 (1923) (embezzle-

---

3. For a discussion on use of "uncharged crimes" evidence, *see* EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE (1996).

ment, where the act charged was susceptible of an innocent explanation); *State v. Patterson*, 271 Mo. 99, 196 S.W. 3, 6 (1917) (robbery by extortion, where the circumstances of the act were susceptible of an interpretation indicating innocence)); EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 5:01 (1996) ("[T]he courts are most liberal in admitting evidence to prove mens rea.").

The evidence was both logically and legally relevant to establish the crime for which Skillicorn was charged.

■■■ Skillicorn also challenges the admission of evidence of subsequent burglaries and a robbery he and Nicklasson committed while on the run after the murder. The transcript contains no contemporaneous objection to the evidence of subsequent burglaries. The only somewhat contemporaneous objection challenged the procedure by which the state sought do admit the confession, and was made during the playback of several portions of Skillicorn's confession. No contemporaneous objection of any kind was made at the time the portion of the confession revealing such evidence was played for the jury. The defense made a continuing objection as to "testimony regarding any statements Skillicorn made based on a motion . . . in limine regarding other crimes," before the relevant portions of the confession were played. However, the motion in limine challenges only evidence of other crimes alleged to have been committed by the defendant in Arizona and California. The transcript indicates that the portion of the confession Skillicorn here challenges referred to burglaries and a robbery committed before the pair arrived in Arizona and California. Thus, the alleged error was not preserved.[4] Under plain error review, Rule 30.20, Skillicorn has failed to show that ad-

mission of such evidence so "violated his rights that manifest injustice or a miscarriage of justice" resulted. *Parker*, 886 S.W.2d at 917.

■■■ Skillicorn alleges the trial court also erred in admitting two postcards sent by Skillicorn and Nicklasson from Houck, Arizona, during their flight west. Both postcards depicted cowboys on horses. Both postcards bore the same postage cancellation date, time, and place. Nicklasson's postcard read: "Outlaws on the run, love you much, still would love to have hot heavy sex. Say hi to everyone. Hope you enjoyed the meal." It was signed "Outlaws—Love R.I.P." Skillicorn's postcard read: "from a friend you only met once getting from one place to another— See if this card reminds you of any one you know." Both were addressed to Annie Wyatt in Blue Springs, Missouri. Evidence presented at trial showed that Wyatt was an acquaintance of Nicklasson and that Skillicorn and Nicklasson had taken her and some of her friends to the Blue Springs Country Kitchen the evening of Mr. Drummond's murder. Skillicorn claims these were hearsay and were inadmissible evidence of other crimes.

The transcript shows that these postcards were not admitted for the truth of their contents. Rather, they were admitted to show that Skillicorn and Nicklasson were acting together, that they were a team. As such, they were not inadmissible hearsay and were probative of the issue for which they were presented. Points Seven and Eighteen are denied.

### E. Skillicorn's Statement

Skillicorn alleges reversible error because his confession was improperly admitted in that 1) the warnings he received were inade-

---

4. Although defendant points to a continuing objection made in chambers, that objection is not clear concerning what defense counsel is objecting to and upon what basis the objection is made. The "renewed" objection in court, based upon the motion in limine, serves only to further confuse what defense counsel is seeking to preserve. "It is well settled that an objection to the admissibility of evidence must be specific and contain the proper ground of its exclusion, else the trial court will not be convicted of error for

overruling it." *Appelhans v. Goldman*, 349 S.W.2d 204, 207 (Mo.1961). See also *Rogers v. B.G. Transit Corporation*, —— S.W.2d ——, 1997 WL 226165, No. 21121 (Mo.App.May 7, 1997); *Smith v. State*, 565 N.E.2d 1059, 1061 (Ind. 1991); *Hobson v. State*, 495 N.E.2d 741 (Ind.Ct. App.1986). Even if the point was properly preserved, the admission of evidence of these crimes committed by the pair while they were on the run after Mr. Drummond's murder was not prejudicial.

quate; 2) he was promised leniency in return for his confession; 3) the trial court failed to make adequate findings of fact concerning whether his statement was voluntary; 4) he was illegally interrogated prior to receipt of *Miranda* warnings and, therefore, the statement should be excluded as "fruit of the poisonous tree;" and 5) under the totality of all the circumstances the confession was involuntary. Grounds 1), 2), and 3) were not preserved below. We review them for plain error only. Rule 30.20.

■ In order for Skillicorn to have voluntarily waived his rights to remain silent and to have an attorney present during questioning, his choice must have been "uncoerced," and he must have been aware of his rights and the potential consequences of abandoning them. *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987). "Voluntariness depends on the absence of police overreaching, not on the mental ability of the defendant to make a 'choice.' " *State v. Debler,* 856 S.W.2d 641, 650 (Mo. banc 1993) (citing *Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986)). The determination of police overreaching depends on the circumstances, including the defendant's physical and mental state, and length of questioning. *Spring, supra,* 479 U.S. at 573–74, 107 S.Ct. at 857; *Connelly, supra,* 479 U.S. at 170, 107 S.Ct. at 523.

Skillicorn was read his *Miranda* rights before he made the statement that was used against him at trial. The following discussion took place between FBI Agent McOmber and Skillicorn prior to Skillicorn's confession:

SKILLICORN: Is that the formality?

MCOMBER: No, that's not formality. That's just to make sure I don't say something I shouldn't say.

Basically, all we have here, you've seen the movies where you gotta make sure people understand their rights and this is all that is. I usually like to read this to the people and I like them to understand that and then we talk about it to make sure you exactly understand what's going on, okay.

Uh, 'cause like, uh, Dale said we, we've been straight up with you so far and that's how we're gonna be.'

Before we ask you any questions, you must understand your Rights.

YOU HAVE THE RIGHT TO REMAIN SILENT.

ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT.

YOU HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS, AND HAVE A LAWYER WITH YOU DURING QUESTIONING.

IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU, uh, BEFORE ANY QUESTIONING IF YOU WISH.

IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU CAN STILL HAVE THE RIGHT TO STOP ANSWERING ANY TIME

YOU ALSO HAVE THE RIGHT TO STOP ANSWERING ANY TIME TILL YOU TALK TO A LAWYER.

And why don't you go ahead and read this portion right here to make sure you understand that.

SKILLICORN: I read this statement of my rights and I understand what the rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know I am doing—know what I'm doing. No promises or threats have been made to me and no pressures or certain—

MCOMBER: Coercion.

SKILLICORN: coercion of any kind has been, uh, used against me.

MCOMBER: Okay, sign right there. Formality out of the way.

■ Skillicorn signed an advice of rights form, did not ask for an attorney, and did not, at any time, request to terminate the interview. Skillicorn insists that because he could not properly pronounce the word "coercion" and because no one offered to explain the meaning of that word, his statement was not properly warned and was not voluntary.

The terms "pressure" and "coercion" used in this context mean essentially the same thing. Moreover, Skillicorn's "mental ability to make a choice" is not the measure of voluntariness. *Connelly, supra,* at 169–70, 107 S.Ct. at 522–24; *State v. Debler,* 856 S.W.2d 641, 650 (Mo. banc 1993). "[M]ental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly,* 479 U.S. at 164, 107 S.Ct. at 520. Nor can the agent's statement that the waiver form was a "formality," without more, be considered overreaching.

A confession extracted by a direct or implied promise of leniency is inadmissible. *State v. Chandler,* 605 S.W.2d 100, 116 (Mo. banc 1980). But the record belies Skillicorn's claim that agents offered him leniency in return for his statement. Skillicorn points to the following exchange as an implied promise of leniency:

SKILLICORN: I don't, I'm debatin' whether or not I want to discuss that ... or not, you know. I mean I'm just debatin' it. Because I already know basically that, uh, beyond a reasonable doubt, uh, regardless of what I say, I'm convicted, okay. I mean let's be real,

MCOMBER: So what can you do to help this situation?

SKILLICORN: you know.

. . . . .

MCOMBER: Like you just said, obviously, we would not be sitting here if we didn't have evidence against you. And ... I think I'm gonna try and help you understand here right now is that you are in a position to be the utmost ... for yourself....

. . . . .

SKILLICORN: The only thing you can do is execute me and you're gonna do that regardless of what I say at this table.

MCOMBER: No, that's not the truth ... That's not true.

SKILLICORN: what's gonna motivate me to go into detail about anything?

MCOMBER: The, courts are only concerned with three things. They're con-

cerned, first of all right off the bat, are you cooperative. Do you have a feeling of remorse for what's happened and that's evident, you obviously do. Two, are you willing to come clean and, and, and clear up this whole matter. The truth is what the court sees. That's all they see. And you're in a position right now, Dennis, where you can provide us with more.. with the truth.... Now, I can understand your frustrations and feeling that ... nothing you can do that'll help you.... We believe differently because of the system....

There was no implicit or explicit promise of possible leniency or mitigation of punishment. If defendant had a hope of leniency, that hope sprang "'from the seeds of his own planting [and] is not sufficient to render the resulting confession inadmissible.'" *State v. Hunter,* 456 S.W.2d 314, 321 (Mo.1970) (citations omitted). At most the statements of the interviewing agents were encouragement to cooperate with the courts and law enforcement agencies. "General encouragement to cooperate is far different from specific promises of leniency." *United States v. Pelton,* 835 F.2d 1067, 1073 (4th Cir.1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988); *State v. Schnick,* 819 S.W.2d 330, 336–37 (Mo. banc 1991).

We also reject Skillicorn's claim that the trial court did not make adequate findings of fact concerning the voluntariness of his confession. The court overruled the motion to suppress Skillicorn's statement and stated: "I went through the exhibits you offered at length. Mr. Skillicorn went through his travels or activities. And it's obvious to me it's voluntary based upon reading the statement I have or the exhibit I have." The finding here that the defendant voluntarily made statements is sufficient to support overruling the motion to suppress. "A judge need not make any particular formal finding. The only prerequisite is that the trial court's conclusions make unmistakably clear that the confession is voluntary. If one is informed of his right to remain silent under *Miranda,* and understands his right to remain silent under *Miranda,* and thereafter makes voluntary statements, it is absurd to say that such

person has not made a knowing and intelligent waiver of his right to remain silent." *State v. Schnick, supra* at 336 (citing *Sims v. Georgia*, 385 U.S. 538, 541–43, 87 S.Ct. 639, 642, 17 L.Ed.2d 593 (1967)).

Similarly, Skillicorn's claim that the statement was inadmissible because it was the "fruit" of an unwarned interrogation commencing before the recorded portion of his statement fails for at least two reasons. First, there is no indication that anything more than casual conversation commenced before the recorded statement. Second, even if Skillicorn had been questioned before the recorded statement at issue, "[i]n the absence of some coercion by police in obtaining the original statement, the 'fruit of the poisonous tree' doctrine has no application." *Id.* at 337. There is no evidence of coercion prior to or during the recorded statement.

Finally, Skillicorn asserts that even if each of these claimed violations alone does not amount to reversible error, the totality of the circumstances mandates reversal. There is nothing to suggest any basis for a finding of police overreaching in the present record. *Id.* "The State has the burden of showing by a preponderance of the evidence that a defendant's statements made while in custody were voluntarily given. Absent a showing of special circumstances, the State need only make a prima facie showing of voluntariness." *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980) (citing *State v. Olds*, 569 S.W.2d 745 (Mo. banc 1978); *State v. Nolan*, 423 S.W.2d 815 (Mo. 1968)). "The state sustained its burden of proving by a preponderance of the evidence that under the totality of the circumstances, the defendant's statements were given voluntarily." *Schnick, supra* at 337. Point Thirteen is denied.

### F. Rule of Completeness

Skillicorn next claims the trial court erred in refusing to admit portions of his confession that he sought to present as evidence absolving him of the murder. During his confession, Skillicorn related that he and Nicklasson shot rattlesnakes for sport while in Arizona and that the snakes were "the first thing I ever shot in my life." The trial court ruled that evidence inadmissible. Because Skillicorn failed to include this claim in his motion for new trial, it is reviewed here for plain error, only. Rule 30.20.

The rule of completeness seeks to ensure that a statement is not admitted out of context. The rule is violated only when admission of the statement in an edited form distorts the meaning of the statement or excludes information that is substantially exculpatory to the declarant. *See State v. Collier*, 892 S.W.2d 686, 695 (Mo.Ct.App. 1994). The statement in dispute was not substantially exculpatory. The state never sought to prove that Skillicorn actually shot Mr. Drummond. Thus, that Skillicorn had never shot anything before the rattlesnake was not substantially exculpatory. Indeed, it was basically irrelevant to the inquiry. The failure to admit this statement does not rise to the level of "manifest injustice or a miscarriage of justice...." *State v. Parker, supra*, at 917. Point Fourteen is denied.

### G. Medical Examiner's Testimony

Skillicorn contends that the trial court committed reversible error by admitting the medical examiner's testimony in which he opined that, to a reasonable degree of medical certainty, a person would die within eight days without water. We disagree. "The trial court has broad discretion in ruling on the admissibility of evidence where the issue is relevancy." *State v. Kreutzer*, 928 S.W.2d 854, 867 (Mo. banc 1996). "Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion." *State v. Copeland*, 928 S.W.2d 828, 837 (Mo. banc 1996) (citing *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992)).

The testimony was both logically and legally relevant. Skillicorn argued in his opening statement that he believed Nicklasson was going to tie Mr. Drummond up and leave him in the woods. Skillicorn asserted

that this negated the necessary element of deliberation by him on the murder of Mr. Drummond. The medical examiner's testimony that Mr. Drummond would, within a reasonable degree of medical certainty, die of dehydration within eight days was relevant to contradict the negative inference raised by the defense's theory. Moreover, "where the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar,* 726 S.W.2d 728, 734–35 (Mo. banc 1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). The trial court did not abuse its discretion. Point Fifteen is denied.

### H. Testimony of Agent McOmber

▆▆▆▆▆ Skillicorn challenges the admission of certain testimony by FBI Agent Arthur McOmber. The prosecutor asked "Do you have an opinion whether suspects accused of criminal activity, sir, downplay their involvement in that particular offense." McOmber answered: "Yes. That's quite often the case. We call it minimizing. They minimize their involvement." Skillicorn advances a two-pronged attack on this testimony. He claims that 1) it was improper testimony on issues of witness credibility, and 2) the expert testimony was on a matter within the general realm of common experience of the members of the jury.

McOmber's testimony was a statement of how suspects generally respond. It was generic. As such, it was not testimony directly impugning Skillicorn's credibility. It was not error on that basis. Nor did the trial court commit error by admitting the statement because it was within the realm of the jury's common experience. Skillicorn's authority for this proposition purportedly found in *State v. Lawhorn,* 762 S.W.2d 820 (Mo. banc 1988), is inapposite. That case merely states that a defendant does not have a right to expert testimony when such testimony reiterates what the jury would know by general experience. "Certainly, evidence should be excluded if it unnecessarily diverts the attention of the jury from the question to be decided. But it is within the trial court's

sound discretion whether to admit an expert's testimony." *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984) (citing *State v. White,* 621 S.W.2d 287, 292 (Mo.1981)). The testimony given by FBI Agent McOmber came from his special knowledge as a career law enforcement officer, not from the realm of common experience shared by the members of the jury. Moreover, even if admission of the testimony had been error, Skillicorn fails to demonstrate how such testimony was "so prejudicial that it deprived [him] of a fair trial." *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996) (quoting *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990)). Point Sixteen is denied.

### IV. Jury Issues

### A. Skillicorn's Challenges for Cause

Skillicorn challenged for cause prospective jurors Paul Huddleston, Stephen DeMasters, John Homan, and John Akridge because they exhibited a bias in favor of the death penalty. His challenges were denied by the trial court. Skillicorn attacks those rulings. In a separate point, Skillicorn claims the trial court also erred by sustaining the state's objection to a question his attorney presented to venireperson Richard Heitmeyer. Skillicorn did not challenge Heitmeyer for cause. Skillicorn exercised a peremptory challenge against each of these venirepersons. Skillicorn alleges that the denial of the for cause challenges against Huddleston, DeMasters, Homan, and Akridge, and the curtailment of his questioning of Heitmeyer violated his rights to a fair trial, to be free from cruel and unusual punishment, and to make cause and peremptory challenges intelligently.

▆▆▆▆▆ "The trial court has wide discretion in determining the qualifications of jurors, and its decision thereon will not be disturbed absent a clear abuse of discretion and a real probability of injury to the complaining party." *State v. Copeland, supra,* at 852. As Skillicorn concedes, we have previously rejected his argument. In *State v. Richardson* we stated:

"*State v. Gray* ... made clear that the right to a list of qualified jurors from which to make peremptory strikes is statutory. The relevant statute was amended in 1993. It currently provides that a potential juror's qualifications do not constitute grounds for a new trial or reversal if the juror was removed by a peremptory strike and did not serve. Section 494.480.4, RSMo Supp.1993."

*State v. Richardson*, 923 S.W.2d 301, 310 (Mo. banc 1996). Venirepersons Huddleston, DeMasters, Homan, Akridge, and Heitmeyer did not serve as jurors; therefore, the trial court did not commit reversible error. Points Eleven and Twenty are denied.

### B. Death Qualification

Skillicorn contends the trial court's denial of his motion to prohibit death qualification of the jury violated his right to a fair trial, to be free from cruel and unusual punishment, and the rights of prospective jurors to equal protection of the law. This issue has been raised and rejected numerous times by both the United States Supreme Court and this Court. *See, e.g., Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986); *State v. Nave*, 694 S.W.2d 729, 735–736 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986). Reconsideration is not merited. Point Seventeen is denied.

### V. Guilt/Innocence Phase

### A. Instructions 10 and 11

 Skillicorn claims the trial court erred in submitting instructions patterned after the Missouri Approved Instructions–Criminal (MAI–CR 3d) in lieu of his proffered instructions. He argues that jury instruction 10 and its converse, instruction 11, failed to properly present the element of deliberation.

Skillicorn's proffered instruction in lieu of instruction 10 was:

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about August 24, 1994, in the County of Lafayette, State of Missouri, Allen Nicklasson caused the death of Richard Drummond by shooting him, and

Second, that Allen Nicklasson knew that his conduct was practically certain to cause the death of Richard Drummond, and

Third, that Allen Nicklasson did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Richard Drummond, the defendant aided or encouraged Allen Nicklasson in causing the death of Richard Drummond and did so after deliberation ***upon the death of Richard Drummond,*** which means cool reflection upon the matter for any length of time no matter how brief, then you will find the defendant guilty of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree (emphasis added).

Instruction 10, as given, excluded the highlighted provision, tracking MAI–CR 3d 304.04 and its notes on use exactly. The converse instruction first proposed by Skillicorn read:

If you have a reasonable doubt as to whether the defendant, with the purpose of promoting or furthering the death of Richard Drummond, aided or encouraged Allen Nicklassoin [sic] in causing the death of Richard Drummond and did so after deliberation ***by the defendant,*** which means cool reflection on the matter for any length of time no matter how brief, you must find the defendant not guilty of Murder in the

First Degree as submitted in Instruction No. _____. (emphasis added).

The court rejected this instruction, but accepted the above version presented by Skillicorn, which did not contain the italicized portion. Instruction 11, as given, complied with MAI–CR 3d 308.02 and tracked the language of the verdict director in accordance with the notes on use.

Skillicorn maintains that the italicized language, excluded from the two instructions, was necessary to clearly present the element of his deliberation. We disagree. Instructions 10 and 11, as given, were sufficiently clear to inform the jury that, in order to find Skillicorn guilty of first degree murder, they had to find that he deliberated on murdering Mr. Drummond. The instructions tracked the language of our approved instructions, and similar instructions have been approved in *State v. Ervin*, 835 S.W.2d 905, 922–23 (Mo. banc 1992), and *State v. Kreutzer, supra*, at 871. Points Five and Six are denied.

### B. Instruction 5

The trial court submitted instruction 5, which reads:

> If you find and believe from the evidence that defendant was involved in offenses other than the one for which he is now on trial and the offenses mentioned in Instruction No. 14 and Instruction No. 15, you may consider that evidence on the issue of identification, motive, intent, absence of mistake or accident, or presence of a common scheme or plan. You may not consider such evidence for any other purpose.

Skillicorn challenges this instruction because the trial court included all five of the possible purposes (as set forth in the MAI–CR 3d 310.12) for which such evidence could be used without specifying a particular purpose or purposes for which the evidence could be considered. Neither at the time of the objection nor in his brief to this Court does Skillicorn explain which of the five issues were not supported by evidence at trial, or how the instruction as given could be prejudicial. Point Eight is denied.

### C. Motion for Judgment of Acquittal

Skillicorn claims the trial court erred in denying his motion for judgment of acquittal based upon insufficiency of the evidence on the element of deliberation.

On review [for sufficiency of the evidence], the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary. In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.

*State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993) (quoting *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)). The jury may infer deliberation from circumstances that indicate "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 1994; *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

The unique role of premeditation in the law of accomplice liability was clarified in *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992) where this Court held that, pattern instructions to the contrary notwithstanding, "a first-degree murder instruction premised on accessory liability must ascribe deliberation to the defendant. And where the State's theory is accomplice/accessory liability, the jury must also find that the defendant had a purpose to aid another in the commission of the crime." This is so because it is the element of deliberation that sets first degree murder apart from all other forms of homicide. Both second degree murder and first degree murder require that the act be intentionally done. Only first degree murder requires the cold blood, the unimpassioned premeditation that the law calls deliberation. Only where the defendant himself harbors this most despicable mental state does society inflict its severest punishments. Thus, in *Ervin*, the Court made

clear that, while the act of homicide may be imputed to an accessory, the element of deliberation may not be. Proof that the defendant merely aided another with the purpose of facilitating an intentional killing cannot be sufficient to prove first degree murder. . . .

*State v. O'Brien,* 857 S.W.2d 212, 217–218 (Mo. banc 1993) (citations omitted).

▮ The jury had the following portions of Skillicorn's statement before it from which to infer deliberation:

SKILLICORN: And so, I don't know, we get.. we, we get a little ways down the road and, uh, he.. this guy in the seat next to me tells me, uh, that, uh, he's gonna have to, you know, do something to this guy. I tell, him you know, now, we're trying to talk on the pretenses that, that, uh, this guy in the front seat don't hear us, too, right,

MCOMBER: Right

SKILLICORN: 'cause, uh, didn't want him panicking.

\* \* \* \* \* \*

AGENT KELLY: Were you going to tie him up at all, or anything like that?

SKILLICORN: Yeah, well, Al was supposed—supposed to, but he had no way of doing that. He had no rope or nothing. Right? You know—you know, but, uh, that came—that was discussed, tying him up, yeah.

\* \* \* \* \* \*

SKILLICORN: You know, and uh, well, he took him up in the woods, but right before he started taking him up in the woods, I told him—I said, you know, let me get your billfold, let me have your billfold. And he gave me his billfold. Right?

MCOMBER: Mm-hm.

SKILLICORN: And I was standing down there counting the billfold, right? Counting the money in the billfold, right, you know.

\* \* \* \* \* \*

SKILLICORN: Anyway, I got in the driver's seat. Well, I heard two gunshots. Right?

MCOMBER: Mm-hm.

SKILLICORN: They weren't real loud. You know, I heard two gunshots, and they came out.

Skillicorn later stated matter-of-factly that after the gunshots, Nicklasson emerged from the woods having "already done what he had to do."

Skillicorn confessed that he told Mr. Drummond "sorry man, you know, we got to disable this phone, bro', you know. But we're gonna . . . and we're gonna have to take you out in the woods somewhere on one of these side roads, right, and, and lose you . . ." This shows Skillicorn openly told Mr. Drummond about their purported intentions to leave him in the wilderness. The jury could infer from Skillicorn and Nicklasson's admittedly secretive conversation, that they were discussing Mr. Drummond's murder. The jury could also infer that Skillicorn knew Nicklasson was going to kill Mr. Drummond in the woods because he did not have any rope with which to tie him and because of Skillicorn's statements that he heard two shots and that Nicklasson had "already done what he had to do." There was sufficient evidence from which a reasonable juror could find Skillicorn guilty beyond a reasonable doubt of deliberating on the murder of Mr. Drummond and aiding Nicklasson in carrying out the crime. The trial court did not err in denying Skillicorn's motion for judgment of acquittal. Point Three is denied.

### D. The Jury's Request for Exhibit T–18A

Skillicorn claims the trial court abused its discretion by failing to promptly provide an exhibit requested by the jury during its deliberations. During deliberations, the jury requested "the transcript of the conversation between defendant and Agent McOmber." Because the entire transcript had not been admitted into evidence and only portions read or presented to the jury as evidence, the court denied the request. The jury then requested to see "the large boards with the three pages." The defense, state, and court determined that this was exhibit T–18A, a

blown-up version of three pages of the confession. Based upon the jury's previous request and arguments by both the defense and state, the court determined to send back exhibit T–18 and T–6—the portion of the confession admitted into evidence from which exhibit T–18 was drawn. While the court made copies of the exhibits and whited out portions that had not been admitted into evidence, the jury sent word that it had reached a verdict. The trial court offered to send a note to the jury informing it that the requested evidence was available for its review. Defense counsel responded negatively to this offer. The court then permitted the jury to return and render its verdict. The following day, during the penalty phase of trial, defense counsel sought a mistrial based upon the trial court's purported failure to promptly respond to the jury's request in order "to influence the jury's consideration of appellant's statement."

 When an exhibit has been properly admitted into evidence, it is within the sound discretion of the trial court whether the exhibit will be sent to the jury during deliberations. *State v. Graham*, 641 S.W.2d 102, 107 (Mo. banc 1982). It was incumbent upon the trial court to attempt to determine the intent of the jury from its ambiguous request for "the transcript of the conversation between the defendant and Agent McOmber" and its subsequent request to see "the large boards with the three pages." Rather than indicating the court's intent to improperly influence the jury, the court's actions exhibit an abundance of caution in attempting to objectively respond to ambiguous requests of the jury. Likewise, it was within the discretion of the trial court to accept a jury verdict reached before the court supplied the requested exhibits. Under the circumstances, this was not an abuse of discretion. Point Twelve is denied.

### E. Testimony of Allen Nicklasson

 Skillicorn next claims the trial court erred in denying his motion for a continuance while he sought to obtain a writ of habeas corpus ad testificandum to present Nicklasson's testimony to the court. Nicklasson allegedly sent Skillicorn a letter in which he stated "I'm going to try everything in my power to get your death penalty conviction overturned. No matter what you say or anyone else, your situation is my fault."

Rule 29.11(b) provides:

(b) Time for Filing Motion. A motion for a new trial or a motion authorized by Rule 27.07(c) shall be filed within fifteen days after the return of the verdict. On application of the defendant made within fifteen days after the return of the verdict and for good cause shown the court may extend the time for filing of such motions for one additional period not to exceed ten days.

"We decide a case on appeal solely upon the assignments preserved in the motion for new trial." *State v. Worley*, 353 S.W.2d 589, 596–97 (Mo.1962). Skillicorn concedes his oral request to present "newly discovered evidence" was untimely. Nevertheless, he claims that the proffered evidence is such that the strictures imposed by Rule 29.11 should be ignored and the case remanded for new trial, or for a new punishment hearing, or that this Court should set aside the death sentence and enter a sentence of life imprisonment.

 The court of appeals decisions cited by Skillicorn for his claim of error have no similarity whatever to Skillicorn's case. *See State v. Mooney*, 670 S.W.2d 510 (Mo.Ct. App.1984); *State v. Williams*, 673 S.W.2d 847 (Mo.Ct.App.1984). Once the time within which to file a motion for new trial has expired, a remedy no longer lies through direct appeal. *Wilson v. State*, 813 S.W.2d 833, 834–35 (Mo. banc 1991). Moreover, we find nothing in Nicklasson's letter that is particularly exculpatory for Skillicorn. Although the statement admits Nicklasson's guilt, it does not negate Skillicorn's culpability. Point Nineteen is denied.

### VI. Penalty Phase

### A. Dr. Spiridigliozzi's Testimony

Skillicorn asserts that the trial court erred in excluding the testimony of Dr. John Spiridigliozzi offered during the penalty phase. Spiridigliozzi carried a file pertaining to Skillicorn with him to the stand. The state sought to review the file, claiming that the

evidence was discoverable and had not been disclosed in response to a proper request made pursuant to Rule 25.05(A)(1). Skillicorn's counsel claimed the attorney-client privilege, the physician-patient privilege, and that the file was work product. The court ordered Skillicorn's attorney to turn over the file so that the prosecutor could review the documents briefly before testimony of Dr. Spiridigliozzi was received in open court. Skillicorn's attorney refused, attempting to physically block the passage of the file from Spiridigliozzi to the prosecutor. The court issued an ultimatum to Skillicorn's attorney: surrender the file, or have Dr. Spiridigliozzi's testimony excluded. Skillicorn's attorney was recalcitrant, continuing to refuse to hand over the file. The court dismissed Dr. Spiridigliozzi as a witness after the defense made its offer of proof.[5]

■ Regardless of whether the file should have been turned over prior to trial pursuant to the state's discovery request, once Dr. Spiridigliozzi sought to testify concerning Skillicorn's mental condition, it was appropriate for the trial court to order the file to be turned over. Placing Skillicorn's mental condition in issue waived the privilege accorded by Section 491.060, RSMo. That section provides:

The following persons shall be incompetent to testify:

\* \* \* \* \* \*

(5) A physician licensed under chapter 334, RSMo, a licensed psychologist or a dentist licensed under chapter 332, RSMo, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe and provide treatment for such patient as a physician, psychologist or dentist.

"The physician-patient privilege has no constitutional underpinning and is statutory in origin." *State v. Ward,* 745 S.W.2d 666 (Mo. banc 1988). "The physician-patient privilege and the attorney-client privilege are to be used for preserving legitimate confidential communications, not for suppressing the

truth after the privileged one lets the bars down." *State v. Carter,* 641 S.W.2d 54, 59 (Mo. banc 1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983). "It is well settled that when a party once places the question of his mental condition in issue he thereby waives the physician-patient privilege to exclude testimony of any doctors who have examined him for that purpose." *Id.* at 57. "This waiver, sometimes called the 'patient-litigant' waiver, has been recognized in many jurisdictions." *Brandt v. Medical Defense Associates,* 856 S.W.2d 667, 671 (Mo. banc 1993).

■ Such a waiver is a full waiver. There are at least two reasons for this guiding principle that a waiver is a full waiver. First, the medical privilege only covers matters that are confidential. Once there is a disclosure of the information in any form, it is no longer confidential and therefore no longer privileged. Second, and even more important, the Missouri courts have made it abidingly clear that a patient should not be allowed to use the medical privilege strategically to exclude unfavorable evidence while at the same time admitting favorable evidence. We have referred to this prohibited practice as "permitting the plaintiff to use the privilege both as 'a shield and a dagger at one and the same time' (which we do not believe the legislature intended)...."

*Id.* at 672 (citations omitted). Once Dr. Spiridigliozzi sought to testify concerning his examination of the defendant, any information compiled by Dr. Spiridigliozzi pertaining to his examination of Skillicorn was no longer privileged.

■ Nor could the work product doctrine insulate Dr. Spiridigliozzi's notes from disclosure and use at trial. "Work product consists of 'opinions, theories or conclusions of defendant's attorney ... [and] communications between defendant and his attorney.'" *Carter,* 641 S.W.2d at 59 (citations omitted). Dr. Spiridigliozzi's notes were not an opinion, theory or conclusion of defendant's counsel or a communication by defendant to his attorney, and therefore were not the work

---

5. All of these events occurred in the trial judge's chambers, out of the hearing of the jury.

product of the attorney. Hired on a one-time basis to give defendant a psychiatric examination and prepare an objective report on defendant's mental condition, Dr. Spiridigliozzi acted in the capacity of an independent contractor, not as an agent of defense counsel in any real sense of the word, and not as a member of defense counsel's legal or investigative staff.

Regardless of what took place before the trial, the court properly found that the file held by Dr. Spiridigliozzi was discoverable because no privilege existed as to those materials. Thus, the court properly ordered the defense to permit the prosecutor to examine the file. Defense counsel's refusal to hand over the file was a "[w]ilful violation by counsel of ... an order issued pursuant" to an applicable discovery rule, and the court was well within its discretion to exclude testimony evidence relating to the file. Rule 25.16. Point Two is denied.

### B. Unconstitutionality of Missouri's Proportionality Review

Skillicorn claims his rights to due process and to effective assistance of counsel are violated by Missouri's proportionality review scheme. Essentially, he argues that the review scheme is arbitrary and that such arbitrariness both violates the Due Process Clause and forecloses effective assistance of counsel. These claims were not preserved in his motion for new trial and are reviewed for plain error, only. Rule 30.20.

The right to effective assistance of counsel refers to the defendant's right to an attorney whose skill, care, and diligence comports with that of a reasonably competent attorney. *State v. Parker*, 886 S.W.2d 908, 929 (Mo. banc 1994). To gain relief on an ineffective assistance of counsel claim, a defendant must show his counsel failed to meet this standard and that he was prejudiced thereby; *i.e.*, there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Shurn, supra* at 468. Skillicorn appears to claim that the purported arbitrariness of Missouri's proportionality scheme precluded his counsel from effectively representing him. Because the right to

effective assistance of counsel is objectively determined by the counsel's performance under the law as it exists, his counsel cannot have been ineffective merely because the law on a particular issue is ambiguous, complicated, or even arbitrary.

Moreover, this Court has repeatedly rejected Skillicorn's due process argument, *State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *State v. Shurn*, 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994); *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994), as have the federal courts. *Byrd v. Delo*, 942 F.2d 1226 (8th Cir.1991). Point Twenty One is denied.

### C. Section 565.035 Independent Review of Death Sentence

Pursuant to Section 565.035, RSMo, this court independently reviews the sentence of death to determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of statutory aggravating circumstances under Section 565.032; and whether the sentence of death was excessive or disproportionate to the penalty imposed in similar cases. Skillicorn challenges his sentence only upon disproportionality.

The Court finds that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence did support the jury's finding of statutory aggravating circumstances. The trial court entered the sentence, on recommendation of the jury, after hearing argument by the defense and state concerning the appropriateness of the death penalty. The record reflects the court's deliberate and unimpassioned sentencing of Skillicorn.

The evidence supports the jury's finding of statutory aggravating circumstances pursuant to Section 565.032, RSMo. The jury found the following aggravating circumstances: 1) Skillicorn was convicted on September 19,

1980 of murder in the second degree; 2) the murder of Mr. Drummond was committed while Skillicorn was engaged in the perpetration of kidnapping and while Skillicorn was knowingly aiding Nicklasson and DeGraffenreid in the perpetration of kidnapping; and 3) the murder of Mr. Drummond was committed while Skillicorn was engaged in the perpetration of robbery. *See* Sections 565.032.2(1), RSMo 1994 and 565.032.2(11), RSMo 1994. The evidence supports these findings.

 Finally, Skillicorn's sentence is not disproportionate to sentences imposed in other cases, in light of the crime and the strength of the evidence against him. Skillicorn and Nicklasson took Mr. Drummond, a man Skillicorn, himself, designated a "good Samaritan," at gunpoint, to a secluded place and murdered him merely because he *might* cause them the inconvenience of having to elude the police if he reached a telephone too quickly. Murder to avoid inconvenience to the murderer exhibits a lack of respect for human life that has been held to warrant the harshest penalty. *See State v. Gray,* 887 S.W.2d 369, 389 (Mo. banc 1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *State v. Parker,* 886 S.W.2d 908, 934 (Mo. banc 1994), *cert. denied,* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). Moreover, Skillicorn's crimes graduated in severity from burglary to kidnapping and eventually to murdering Mr. Drummond. *State v. Betts,* 646 S.W.2d 94 (Mo. banc 1983). The sentence is not disproportionate. The nature of the crime and the strength of the evidence support the sentence of death. Point Twenty Two is denied.

## VII. Conclusion

The judgment is affirmed.

HOLSTEIN, C.J., and LIMBAUGH and WHITE, JJ., concur.

ROBERTSON, J., concurs in part and concurs in result in part in separate opinion filed.

BENTON, J., concurs in opinion of ROBERTSON, J.

COVINGTON, J., dissents in separate opinion filed.

ROBERTSON, Judge, concurring in part and concurring in result.

I concur in the holding of the principal opinion affirming the conviction and death sentence and the overruling of the appellant's Rule 29.15 motion. I do not agree, however, with the analysis the principal opinion employs to conclude that the trial court did not err in its decision to admit evidence of the appellant's uncharged assault on Keri McEntee. Nor do I agree with the conclusion Judge Covington reaches in her dissent that a new trial is warranted because the trial court admitted this evidence. Therefore, I must write separately, if briefly, to express my understanding of the proper analysis of this evidence.

In her dissent, Judge Covington correctly states the legal analysis of the uncharged-bad-acts evidence. I need not repeat her effort, beyond agreeing with her that the principal opinion fails to justify its conclusion on the McEntee assault under the precedent this Court has consistently followed. *State v. Bernard,* 849 S.W.2d 10 (Mo. banc 1993); *State v. Sladek,* 835 S.W.2d 308 (Mo. banc 1992); *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304 (1954).

I do not agree, however, with Judge Covington's conclusion that the erroneous admission of evidence of the McEntee assault requires reversal of the conviction in this case. That the evidence of uncharged bad acts is error is the product of an analysis that weighs the logical relevance of evidence (the evidence tends to make the existence of material fact more or less probable) against its legal relevance (the cost of the evidence in terms of its potential for prejudice to the defendant or confusing the jury). *See Sladek,* 835 S.W.2d at 314 (Thomas, J., concurring). The word "prejudice" does not carry the same meaning in every context. Prejudice that requires a conclusion that the trial court erred in admitting a particular kind of evidence is not the same kind of prejudice that requires reversal of the results of a trial.

Trial court error that requires reversal exists if the error more-likely-than-not prejudices the entire proceeding against the appellant. I would style this kind of prejudice "outcome-determinative trial prejudice." Outcome-determinative trial prejudice exists where there is a reasonable probability that the jury would have reached a different conclusion had the error not occurred.

It does not follow, therefore, as Judge Covington seems to imply, that the prejudice that is part of the analysis in determining whether a trial court erred in admitting particular evidence is also per se outcome-determinative trial prejudice. Such a conclusion seems the product of a microscopic examination of one part of the evidence presented at a trial while ignoring the totality of the other evidence against the defendant.

The outcome-determinative-trial-prejudice analysis that I think the law requires asks an appellate court to balance the totality of the evidence the jury properly heard against the evidence it improperly heard. In this case, that balance decisively supports the principal opinion's affirmance of the conviction. The evidence of the multitude of Skillicorn's other sins, properly admitted under the *Bernard–Sladek–Reese* standard, makes Skillicorn's participation in the McEntee assault seem a minor irritant in the comparison. I have no hesitancy in concluding that Skillicorn suffered no outcome-determinative trial prejudice even though the trial court erred in admitting this evidence.

COVINGTON, Judge, dissenting.

I respectfully dissent on the issue of the admissibility of the crimes that Skillicorn committed after Drummond's murder, section III.D of the Court's opinion. The law on admissibility of uncharged misconduct is well settled. The first exhaustive discussion in recent times is contained in *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304 (1954). In *Reese*, the defendant and his companion committed within a two hour time frame a murder during the course of a holdup of a hotel, then an attempted holdup of a liquor store. The state sought to sustain the propriety of showing defendant's commission of the separate, independent, and subsequent crime solely on the theory that such evidence was admissible to prove the identity of the defendant as the perpetrator of the murder for which he was then on trial. The state argued that inasmuch as bullets found at the hotel were identified as having come from the gun that was in the defendant's possession at the later liquor store holdup, and that a bullet from this type of gun killed the victim at the hotel, defendant's possession of the gun at the subsequent holdup linked him with the murder of the victim at the hotel. *Id.*, 274 S.W.2d at 306–07.

This Court recited the well established general rule that proof of the commission of separate and distinct crimes is not admissible unless the proof has some legitimate tendency directly to establish the defendant's guilt of the charge for which he is on trial. *Id.*, 274 S.W.2d at 307. Evidence of other crimes, when not properly related to the cause on trial, violates the defendant's right to be tried for the offense for which he has been indicted. *Id.* The concern is that a jury will convict the defendant for being a bad person instead of finding him guilty because he committed the specific crime for which he is being tried. *State v. Sladek*, 835 S.W.2d 308, 314 (Mo. banc 1992) (Thomas, J., concurring).

The *Reese* Court then laid out the well-settled exceptions to the general rule of exclusion. As has been most recently restated in *State v. Bernard*, generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial; or (6) a signature modus operandi. 849 S.W.2d at 13, 17 (Mo. banc 1993).

*Reese*, *Bernard*, and *Sladek* fully explain the test of whether evidence of other distinct crimes falls within any of these exceptions. Whether the requisite degree of legal relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to

raise a "legally spurious presumption of guilt" in the minds of the jurors. *Reese,* 274 S.W.2d at 307. As a consequence, if the Court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt and the evidence should be rejected. *Id.*

The Court in the present case disregards the teachings of *Reese, Bernard,* and *Sladek.* Evidence of the assault on McEntee does not tend to establish motive, intent, the absence of mistake or accident, or a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other. Nor does the evidence go to prove the identity of the person charged with the commission of the crime on trial. The majority attempts to argue, in a highly speculative fashion, that the details of the assault on Keri McEntee are probative on the issue of deliberation of the murder of Drummond. It is difficult to imagine, and the majority does not adequately explain, how deliberation can be demonstrated by the separate assault on McEntee, a separate and distinct crime occurring several hours after the murder. To say that obtaining firearms from the trunk of Drummond's car and holding them to McEntee's head are relevant to the element of deliberation of the murder of Drummond strains credulity. If the offense against McEntee fits within the "sequence of events surrounding the offense charged," then, what evidence does not? The evidence is not logically relevant. In my view, therefore, the evidence is without probative value.

Even if one assumes, arguendo, that the evidence in dispute has probative value, it is tenuous at best and is far outweighed by the prejudicial effect of the evidence. As the majority opinion reflects, deliberation is the central issue in the case. The state's theory of Skillicorn's liability for first degree murder rests upon Skillicorn's guilt as an accomplice to Allen Nicklasson. Skillicorn challenged his liability for first degree murder on the basis of an inadequate showing of deliberation throughout the proceedings. Skillicorn contended that he believed Nicklasson was going to take Mr. Drummond into the woods and somehow restrain him there and that Nicklasson's murder of Drummond was a complete surprise to him. Admission of the challenged evidence, that Skillicorn and Nicklasson threatened McEntee's life "only a few hours" after the murder took place, very likely may have caused the jury to find that, if Skillicorn committed the offense against McEntee, he committed the offense against Mr. Drummond.

In sum, the evidence is neither logically or legally relevant, and its admission constitutes reversible error.