STATE of Missouri, Respondent,

v.

Richard L. STALLINGS, Appellant.

No. WD 53025.

Missouri Court of Appeals,
Western District.

Oct. 28, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1997.

Application for Transfer Denied
Jan. 27, 1998.

Jeannie A. Willibey, Asst. Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

SMART, Judge.

Richard L. Stallings was convicted, after jury trial, of committing murder in the first degree, in violation of § 565.020, RSMo 1994 [1], for which he was sentenced to life imprisonment without the possibility of probation or parole. He was also convicted of engaging in armed criminal action in violation of § 571.015.1, for which he was sentenced to life imprisonment. The court ordered that the sentences run consecutively. In his appeal, Mr. Stalling claims that the trial court: (1) erred in overruling his objections to parts of the testimony of Brenda Abdekhalig, because the testimony was inadmissible hearsay; (2) erred in allowing into evidence statements that Mr. Stallings made concerning the victim because the evidence was not relevant to any issue in the case; (3) abused its discretion in allowing evidence of an assault by Mr. Stallings on a friend of the victim, as such evidence was inadmissible as evidence of other crimes or bad acts; (4) erred in failing to declare a mistrial or admonish the State during closing argument; and (5) erred in overruling Mr. Stallings' motion to suppress evidence because the affidavit in support of the search warrant was misleading. Because we conclude the foregoing contentions are without merit, we affirm the judgment of the trial court in all respects.

## FACTUAL AND PROCEDURAL BACKGROUND

Donna Meredith began a romantic relationship with Mr. Stallings in 1992. The evidence indicates that Mr. Stallings was jealous and possessive of Ms. Meredith. Huey (James) Love was acquainted with both Ms. Meredith and Mr. Stallings. In 1993, after he had been released from prison, Mr. Love started seeing Ms. Meredith but stopped seeing her because Mr. Stallings warned Mr. Love that "he felt like I was coming between him and his woman and he thought he was going to have to do something to me." Mr. Stallings also threatened Willie Wells, a friend of Ms. Meredith, leaving a message on Mr. Wells' answering machine telling Mr. Wells to stay away from Ms. Meredith. The message continued that Mr. Wells "was a lucky man because if it had been yesterday, I [Wells] would have been dead and I would have never known why I was being killed." When Mr. Wells next encountered Mr. Stallings, during a dart tournament at the My Way Restaurant and Lounge, Mr. Stallings told Mr. Wells to stay away from Ms. Meredith. Mr. Stallings then attacked Mr. Wells by hitting him with a chair. At some point during the ensuing altercation, Mr. Wells left the restaurant and drove off in his car. Mr. Stallings pursued Mr. Wells, but ultimately wrecked his own car before the police arrived. Ms. Meredith's sister testified that in December 1994, Mr. Stallings threatened to kill a male friend who complimented Ms. Meredith.

Ms. Meredith broke up with Mr. Stallings in late 1994. She confided to her daughter, Zena Miles, and her best friend, Brenda Abdekhalig, her fears concerning Mr. Stallings. Ms. Abdekhalig testified that Ms. Meredith had told her that Mr. Stallings had continued to call even after the break up. On one occasion, Ms. Abdekhalig went over to Ms.

1. All sectional references are to Missouri Revised Statutes 1994, unless otherwise indicated.

Meredith's home and saw Mr. Stallings, who gave her an angry look. When Ms. Meredith later telephoned Ms. Abdekhalig, Ms. Meredith was crying. She told Ms. Abdekhalig that Mr. Stallings had beaten her up, thrown her on the bed, stuck a pistol in her mouth, and told her that he would kill her. Ms. Miles testified that she had observed a change in the relationship between Mr. Stallings and her mother. She recounted that on one occasion in late December 1994 or early January 1995, Ms. Meredith told her, "If I come up dead, Richard did it."

Ms. Meredith began to see Mr. Love again in December 1994, after her break up with Mr. Stallings. On Saturday, January 21, 1995, Ms. Meredith had scheduled a date with Mr. Love. At approximately 6:30 p.m., Mr. Love noticed that he was being followed by Mr. Stallings in his car. Mr. Love called Ms. Meredith to get the number of Mr. Stallings' car phone but he could not reach Mr. Stallings. Later, Mr. Love called Ms. Meredith back. She told him she couldn't talk because Mr. Stallings was there. Ms. Meredith received other calls that evening. At about 8:00 p.m., Ms. Abdekhalig called. Ms. Meredith, in a nervous voice, said that she had company. Ms. Meredith said she would call back. Ms. Meredith called her daughter at about 9:30. She was nervous and told her daughter that she "had company" and then hung up the phone. Mr. Wells called Ms. Meredith around 10:00 p.m. Ms. Meredith told Mr. Wells that she needed to talk to him. When Mr. Wells asked what was wrong, Ms. Meredith replied, "Richard's here." Mr. Wells heard Mr. Stallings say, "Hang up the phone, hang up the—bitch, hang up the phone."

At 11:15 p.m. Mr. Stallings was stopped by Officer Kurtis Schmidt at Linwood and Prospect, a two to five minute drive from Ms. Meredith's house. The officer pulled Mr. Stallings over for running a red light. Mr. Stallings appeared nervous, "more nervous than a normal person on a traffic stop." He was also sweating around his forehead, a fact the officer found unusual in January. Officer Schmidt noticed that Mr. Stallings was wearing purple leather pants.

Ms. Abdekhalig drove past Ms. Meredith's home about 1:30 a.m. and saw that Ms. Meredith's car was in the driveway. Ms. Meredith did not attend church or a planned brunch the next day. On Monday, at about 4:00 a.m., Mr. Love drove past Ms. Meredith's house. He noticed that Ms. Meridith's car was parked in the driveway instead of the garage, which was unusual. Mr. Love, concerned for Ms. Meredith's safety, contacted the police. They knocked and received no answer. Although the police observed that there was a bullet hole in the bedroom window, they determined that the house was locked and decided not to attempt a forced entry. They returned when Ms. Meredith did not show up for work on Monday morning. After forcing their way into the home, the police found Ms. Meredith's body in a hallway. She had been shot four times in the head. Several items of jewelry were missing, as were $300.00 in cash and the tape in Ms. Meridith's answering machine.

Pursuant to a search warrant, the police recovered clothing worn by Mr. Stallings on the evening of January 21. Specifically, the police recovered the purple leather pants that Mr. Stallings was wearing the night of the murder. The pants had a reddish-brown stain on the lower part of the legs. Tests showed the stain to be human blood. The DNA profile of the blood matched Ms. Meredith's blood. The DNA criminalist who conducted the test testified that the blood would not have a frequency greater that six out of one billion people.

At his trial, Mr. Stallings presented a defense based upon alibi. Some friends claimed that he had been bar hopping with them (except during the time Mr. Stallings was pulled over for speeding). The jury returned a verdict of guilty on both counts and the trial court sentenced Mr. Stallings to life imprisonment without the possibility of probation or parole on the first degree murder count and to life imprisonment on the armed criminal action count. Mr. Stallings appeals.

## BRENDA ABDEKHALIG'S TESTIMONY

In Point I, Mr. Stallings contends that the trial court committed plain error, and abused

its discretion, in overruling objections to testimony given by Brenda Abdekhalig, a friend of Ms. Meredith. Mr. Stallings contends that this testimony constituted inadmissible hearsay. Ms. Abdekhalig testified that Ms. Meredith told her that: (1) Mr. Stallings kept calling her after they had broken up; (2) Ms. Meredith's phone wire had been cut two weeks before her death; and (3) Mr. Stallings had beaten up Ms. Meredith, put a gun in her mouth, and told her he would kill her. Mr. Stallings claims that the evidence was prejudicial because it portrayed him as threatening and violent toward Meredith, leading the jury to infer he murdered her.

The trial court sustained Mr. Stallings' objections to the first two remarks that Mr. Stallings presents for our review. During the State's direct examination of Ms. Abdekhalig, the following occurred:

Q. [By the Prosecution]: Can you tell us any specifics regarding the rocky relationship between Donna and the defendant?

A. Well, they were supposed to have been broken up, hadn't been seeing each other, but Richard [was] still calling her all the time like he was stalking her.

[Defense]: Your Honor, I object to this characterization.

Q. THE COURT: Sustained. Unless you know of your own knowledge—do you know this of your own knowledge?

A. THE WITNESS: No. It's per Donna.
THE COURT: Sustained then.

Q. [By the Prosecution]: What did you observe with respect to the defendant? Did you ever observe him stalking or threatening Donna?

A. No. Only thing I can say is what she had said when she was talking.

Q. All right. Let's talk about a time frame here. In the weeks immediately prior to her death what did the victim say about the defendant as far as his relationship with her?

[Defense]: Objection, hearsay, your Honor.

THE COURT: Sustained.

[Prosecution]: May we approach the bench?

(Counsel approached the bench and the following proceedings were had:)

[Prosecution]: Judge, that's why I filed the trial brief. I think the statements of the victim made to her are not hearsay because it goes directly to the state of mind of the victim, which is relevant to show the motive of why this killing took place. That's the exception to the hearsay.

[Defense]: The statements we're talking about were made two weeks and three weeks in advance of anything that has happened to her.

THE COURT: I don't know that we have laid that foundation. That's the reason I sustained the objection. I think in my view within two weeks of the death is not remote and is relevant, but I—I don't think we have established that.

[Prosecution]: I'll ask the question.

(The proceedings returned to open court.)

Q. [Prosecution]: Ma'am, what I want to focus on again is the two, maybe three weeks leading right up to her death, right before her death, which would have been January of '95. Could you tell us any statements she made to you during that time frame about the defendant, any threats he had made against her?

A. Well, she was upset. Someone had cut—her phone wire had been cut; one time Donna called me crying, you know. I was over at Donna's one day and we were sitting in one of the bedrooms talking, and she keeps her windows cracked, and Richard was over before I left and he had to go get some food for her, and when the doorbell rang, I got up to leave, then Richard—you know, she opened the door. Richard was there and it was like he was looking at me like, you know, he could do something bad to me. He kept his hand in his pocket.

[Defense]: Your Honor, I object to this as speculative testimony.

[Prosecution]: She's saying what she observed.

THE COURT: Sustained.

A. When Donna called me, she told me Richard had beat her up, threw her on the bed, took a pistol, put it in her mouth, told her he would kill her. I guess he heard about our conversations and that he hated me.

Q. [Prosecution]: When was the last time you talked to Donna?

A. I called her Saturday from work.

■ The defense objected to Ms. Abdekhalig's testimony that Mr. Stallings was calling Ms. Meredith "all the time" after the breakup, and her testimony that Ms. Meredith's telephone wire had been cut. These objections were sustained. No further relief was requested. Defense counsel did not ask that the remarks be stricken or that a mistrial be declared. Where the trial court grants the relief requested by a defendant, nothing is preserved for review. *State v. Woodworth*, 941 S.W.2d 679, 698 (Mo.App.1997). We assume that the action taken by the trial court is adequate; if mistrial is warranted then the burden is on defense counsel to request such relief. *Id.* A defendant will not be heard to complain about the failure of the trial court to take action that was not requested. *State v. Miller*, 653 S.W.2d 222, 226 (Mo.App.1983).

■ No objection was made in relation to Ms. Abdekhalig's testimony that Mr. Stallings beat up Ms. Meredith, threw her on the bed, and put a gun in her mouth. Mr. Stallings now contends that this evidence is inadmissible hearsay, requesting plain error review. Review for plain error is governed by Rule 30.20. *See State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). A defendant will prevail on plain error review only when he can show that the trial court's error was so substantial so as to have violated his rights and that a manifest injustice or miscarriage of justice will occur if the error goes uncorrected. *State v. Skillicorn*, 944 S.W.2d 877, 884 (Mo. banc 1997). We fail to see that this is a case for plain error review. Other evidence also showed that Mr. Stallings was extremely possessive and jealous about Ms. Meredith. There was evidence that he was in Ms. Meredith's home on the last time she was known to be alive, that he had called her "bitch," and that he was stopped by the police a short time later only a short distance from her home. It was observed at the time of the traffic stop that Mr. Stallings was clad in purple leather pants. These pants, later recovered in Mr. Stallings' home pursuant to a search warrant, were found to be covered with Ms. Meredith's blood. Mr. Stallings could not give a credible explanation of how the blood came to be on his pants. We decline to review this point for plain error. Point I is denied.

**RELEVANCY**

Mr. Stallings argues that the trial court plainly erred in admitting and overruling his objections to: (1) Ms. Miles' testimony that she heard Mr. Stallings tell Ms. Meredith, "I love you, I love you," and then state "Can't nobody have you." (2) Mr. Love's testimony that Mr. Stallings warned him that Mr. Stallings felt Mr. Love was coming between him and his woman and that he was going to have to do something; (3) Ms. Abdekhalig's testimony regarding Mr. Stallings' threatening look and that he had heard about her conversations with Ms. Meredith and hated her; (4) testimony given by Mr. Wells about the message Mr. Stallings' left on Mr. Wells' answering machine that he was to stay away from Ms. Meredith and, in a subsequent telephone conversation, that Mr. Wells was lucky because he wasn't dead; (5) Ms. Walsh's testimony that she had introduced a male friend to Ms. Meredith and, that when the friend complimented Ms. Meredith, Mr. Stallings threatened to kill him; and (6) Ms. Davis' testimony that shortly before the murder Mr. Stallings told her he had broken up with Ms. Meredith and stated, "I don't care if the bitch is dead." Mr. Stallings contends that this evidence was not relevant to any of the issues in the case and was prejudicial as it portrayed him as a violent and threatening individual. The State argues that all of this evidence was admissible as evidence of motive—Mr. Stallings' obsession with Ms. Meredith and his single-minded determination that if he could not "have" Ms. Meredith then no one else would either.

The defense did not object at trial to most of the evidence in question. Mr. Stallings' motion for new trial did not mention any of this testimony. Mr. Stallings requests plain error review. Plain error review should not be used as a substitute or as a justification to review every point that has not otherwise been preserved for review. *State v. Clemons*, 946 S.W.2d 206, 224 (Mo. banc 1997). Mr. Stallings attempts to invoke plain error review in precisely this fashion, as a scattershot approach to appellate review, with the apparent hope that one of his salvos will hit the target. None of his unpreserved claims provide a substantial basis for believing that a manifest injustice or a miscarriage of justice has occurred. *Id.* We therefore, again decline review. In any event, the contested evidence in the instant case is unquestionably relevant as evidence of motive and intent. It is developed against the background of the larger mosaic, the relationship between the defendant and the victim. The State is allowed great latitude in developing evidence of motive. *State v. Shurn*, 866 S.W.2d 447, 457 (Mo. banc 1993). "Where the defendant claims innocence, evidence of motive, or absence of motive, is relevant." *Id.*

## UNCHARGED CRIMES OR BAD ACTS

In Point III, Mr. Stallings charges that the trial court abused its discretion in permitting the State, over objection, to introduce evidence of Mr. Stallings' assault on Willie Wells, a friend of Ms. Meredith. Mr. Stallings claims that this evidence is evidence of other crimes or bad acts and is not relevant to any of the issues in the case. The State claims, however, that this evidence is relevant in that it showed Mr. Stallings' motive for killing Ms. Meredith.

Mr. Wells testified that he was attending a dart tournament at the My Way Restaurant and Lounge when he saw Mr. Stallings. Mr. Stallings told him, "We got something to take care of." Mr. Wells testified that immediately before Mr. Stallings began the fight, Mr. Stallings "told me I better stay the hell away from Donna Meredith or, like I said, at the time he called me on the phone he told me I was going to die and wouldn't have known

what I was dying for if I didn't leave her alone." Mr. Stallings hit Mr. Wells with a chair. After a struggle, Mr. Wells managed to get away from Mr. Stallings. He got into his car and drove off. Mr. Stallings followed, but ultimately wrecked his car.

The challenged evidence showed Mr. Stallings to be obsessed with and to be extremely possessive and jealous of Ms. Meredith. Such evidence, together with the other evidence of Mr. Stallings' outbursts of extreme possessiveness, is logically and legally relevant on the issues of motive and intent.

An accused has the right to be tried only for the crimes with which he has been charged. *Skillicorn*, 944 S.W.2d at 886. Therefore, evidence of uncharged crimes, wrongs or acts is inadmissible for the purpose of showing that a defendant has a propensity to commit crimes—that if he will commit one offense, it follows that he will commit another. *Id.* However, if the evidence of other crimes is logically and legally relevant, it is deemed admissible. *State v. Clover*, 924 S.W.2d 853, 855 (Mo. banc 1996). Evidence is logically relevant if it has some legitimate tendency to directly establish the guilt of the accused of the charge for which he is on trial; for example, when it tends to establish motive, intent, a common scheme or plan, or the absence of mistake or accident, *Id.* However, these five "recognized exceptions" do not comprise an "exclusive list." *Skillicorn*, 944 S.W.2d at 887.

Legal relevance is demonstrated where the probative value of the evidence outweighs its prejudicial effect. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). This balancing of the probative value and the prejudicial effect rests within the sound discretion of the trial court. *Skillicorn*, 944 S.W.2d at 886. We cannot say that the trial court abused its discretion in admitting this evidence, because the evidence of the altercation between Mr. Stallings and Wells was both logically and legally relevant to the murder of Ms. Meredith. It was logically relevant to show Mr. Stallings' motive for the murder. It was legally relevant because the probative value of the evidence (which shows a pattern of Mr. Stallings' threats to Ms.

Meredith's other suitors and admirers illustrating Mr. Stallings' possessiveness, jealousy and obsessive desire in connection with Ms. Meredith) outweighed its prejudicial effect. Point III is denied.

## CLOSING ARGUMENT

In his fourth point, Mr. Stallings makes that claim that the trial court plainly erred by not declaring a mistrial *sua sponte* where State argued, in closing argument: (1) that Mr. Stallings could not explain how Ms. Meredith's blood got on his pants; (2) that his statement that he did not care "if the bitch was dead" and Ms. Meredith's statement that if she "came up dead, Richard did it" were the two statements from the only eyewitnesses to the crime; (3) that there was no evidence that the blood on Mr. Stallings' pants came from any other place than the victim as she was being murdered. Mr. Stallings contends these references are both direct and indirect references to his failure to testify. The State argues that these remarks were not comments on Mr. Stallings' failure to testify, but on his failure to present evidence on these issues and that Mr. Stallings' failure to object to any of these remarks forecloses his arguments on appeal.

The State began the opening portion of its closing argument with the following:

"I don't care if the bitch is dead." That's what this man said about Donna Meredith just before she was brutally killed.

"If I come up dead, Richard did it." That's what Donna Meredith told her daughter, Zena, just weeks prior to being shot four times in the head at point-blank range.

Those are the two statements we have from the only eyewitnesses in this case, Richard Stallings and Donna Meredith. Nobody else can come in here and tell you what Richard Stallings did to her that evening, and Donna Meredith can't come in here anymore to tell you that this man shot her four times. Donna Meredith can't tell you that now, but the evidence does.

In a later part of the opening portion of its closing argument, the State presented the following argument regarding the blood found on Mr. Stallings' purple leather pants:

And Frank Booth came in here and testified about DNA evidence, and he told you that this blood on this man's pants is Donna Meredith's, that the chance of this blood being anybody other than Donna Meredith is six in one billion, six in a billion. So we know that is Donna Meredith's blood. There hasn't been any evidence to dispute that. And we know that it was splattered on there and it was smeared on there, not just tiny droplet of blood, but a considerable amount of blood. You may look [at] these pants right now and not be able to tell anything. But look at these pictures. Look at the pictures of all the blood on it. That's a lot of Donna Meredith's blood, and this man can't get around that.

You've heard no evidence, none, of how Donna Meredith's blood got on this man's pants. You haven't heard any because he can't explain it. There's no other explanation except for that this man was the man that pulled the trigger four times. That's how the blood got on his pants, and he can't answer that. That's why you heard no evidence from him on that.

After the defense presented its closing argument, the State argued in rebuttal:

What evidence is there in this case, what have we heard from the witness stand that this blood on these pants did not come from Donna Meredith when she was being murdered? I repeat, what evidence do we have in this case that that blood did not come from Donna Meredith when she was being murdered? None. The defense says, "Well, Frank Booth says DNA can be there hundreds of years, and Frank Booth doesn't know how or when it got there." Well, Frank doesn't.

* * * *

Once again, you get back to the basic point. His pants, which he had that night, has her blood splattered all over them, and there has been no evidence from this stand that that came from any other place than Donna Meredith when she was being murdered, and that's what you have to base your judgment on and base your verdict on, what we heard from here, not things

that may or could not have happened in the past.

■■■■ "A court should rarely grant relief on assertions of plain error at guilt-phase closing because, absent an objection, the trial court's options are limited to an uninvited interference with summation, which increases the risk of error." *State v. Storey,* 901 S.W.2d 886, 897 (Mo. banc 1995). It is up to the defendant to demonstrate that a manifest injustice or miscarriage of justice will occur if the error is not rectified. *State v. Zindel,* 918 S.W.2d 239, 241 (Mo. banc 1996). Because Mr. Stallings did not object to the remarks he now contends were prejudicial, review, if any, is for plain error. It is extremely rare for a court to grant relief based upon assertions of plain error pertaining to the State's closing argument. During closing argument, the prosecutor has the right to argue the evidence and the reasonable inferences drawn therefrom. *Clemmons v. State,* 785 S.W.2d 524, 530 (Mo. banc 1990). As a general rule, argument which does not misstate or manipulate the evidence and does not relate to specific rights is deemed to be constitutionally permissible. *State v. Ramsey,* 864 S.W.2d 320, 330 (Mo. banc 1993).

■■■■ The prosecutor may not comment adversely upon a defendant's failure to testify. *State v. Richardson,* 923 S.W.2d 301, 314 (Mo. banc 1996). The prosecutor is forbidden to directly comment upon the defendant's failure to testify by using words such as "defendant," "accused," and "testify" or their functional equivalents. *Id.* Nor may the prosecutor make any indirect reference to a defendant's failure to testify. *Id.* Direct references generally require reversal of the conviction; indirect references, however, are improper only where it appears that the prosecutor's argument demonstrates a calculated attempt to magnify the defendant's decision not to testify in order to call it to the attention of the jury. *State v. Lawhorn,* 762 S.W.2d 820, 826 (Mo. banc 1988).

■■■■ In the instant case, none of the portions of the argument that Mr. Stallings complains of constitute either direct or indirect references to his failure to testify. The State's argument was directed to Mr. Stallings' failure to offer evidence, particularly

evidence to explain the blood found on his purple leather pants. The first portion of the argument is referring to statements made by Mr. Stallings and Ms. Meredith. The State is, in effect, arguing during this portion of the argument that the evidence spoke for Ms. Meredith as she was unable to speak for herself. The other portions of the argument that Mr. Stallings complains of are references to the lack of explanation provided by the defense for the blood found on the purple leather pants. "The State may refer to a defendant's failure to offer evidence so long as there is no reference to the defendant's failure to testify." *State v. Phillips,* 940 S.W.2d 512, 519 (Mo. banc 1997) (citation omitted). In the instant case, the State was pointing out that Mr. Stallings, who did mount a defense and present evidence, did not present any evidence to account for the presence of blood on the pants and the cowboy boots. Furthermore, Mr. Stallings is in error where he concludes that the reference to the "witness stand" in the State's closing argument is a direct reference to his failure to testify because the only explanation for the blood coming from the witness stand would have to come from Mr. Stallings. This is not necessarily true. The Eastern District considered a similar argument in *State v. Jackson,* 659 S.W.2d 12, 14 (Mo.App.1983), where it examined the statement, "And there has [been] absolutely no explanation from the witness stand as to how the defendant got in the car. Absolutely none." The court found that this remark was not an improper reference to defendant's failure testify, either directly or indirectly. *Id.* Point IV is denied.

## SEARCH WARRANT

In his final point, Mr. Stallings claims that the trial court erred in denying his motion to suppress and in admitting Mr. Stallings' leather pants, cowboy boots and evidence pertaining thereto, because the search warrant through which they were acquired was invalid in that it contained material misrepresentations and omissions sufficient to defeat probable cause. The purple leather pants and the cowboy boots were seized by the police on January 26, 1995, following the execution of a search warrant at Mr. Stall-

ings' home. Both the pants and the boots had blood upon them.

Detective Steven Wells executed an affidavit in support of the search warrant, which contained the following:

> On 1-23-95 at 1123 hours, officers of the Kansas City, Missouri Police Department were dispatched to 2331 Montgall to check the welfare of the resident. Upon gaining access to the residence, the body of the victim, Donna M. Meredith, B/F, 3-13-49, was located. Autopsy results indicated that she had been killed by four gunshot wounds to the head. Further examination of the victim's body revealed a broken right thumb nail with hair and fiber recovered from underneath the remaining nail. It also appeared that the victim had been sexually assaulted.
>
> During the crime scene investigation it was determined that a struggle had occurred near where the victim's body was located. The screen on a big screen television had been broken apparently in the struggle and trace amounts of blood were found on the broken pieces of glass.
>
> During the investigation two individuals were interviewed that stated between 1900-2200 hours, on 1-21-95, they had spoke with the victim and she told them that Richard L. Stallings, B/M, 3-15-49, was present at her residence. This is also the last time that the victim was heard from.
>
> Officer of the Kansas City, Missouri Police Department stopped Richard L. Stallings, B/M, 3-15-49 on 1-2-93 at 2315 hours, at 35th and Prospect heading southbound. The vehicle had violated that electric traffic control signal at Linwood and Prospect. Stallings was driving a Maroon 1980 Chevrolet Corvette with Missouri license F4B837 and V.I.N. 1z878AS428555. The location of the violation is approximately six blocks from Donna Meredith's house. Stallings advised the officers that he was going to his home at 9816 Hardesty. At the time of the car stop on 1-21-95, the officer reported that Stallings was wearing purple leather pants. Upon arrest on 1-26-95, Stallings was wearing different clothing, indicating that he had entered his residence at 9816 Hardesty to change clothes.

Mr. Stallings contends that Detective Steven Wells, the officer who executed the affidavit, acted in reckless disregard for the truth by failing to familiarize himself with police reports in the case which contradicted the information in the affidavit. Specifically, Mr. Stallings points to information in the reports which indicates that Ms. Meredith was alive on Sunday, January 22, 1995 and that only one person, not two, had stated that Mr. Stallings was with Ms. Meredith when Ms. Meredith was last heard from.

 For Mr. Stallings to be successful in his attack on the search warrant he must make a substantial showing that the affiant knowingly, intentionally, or with reckless disregard for the truth, included a false statement in the affidavit and that without that false statement the remaining information does not establish probable cause. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). At the suppression hearing, Detective Wells testified that he had not read the other police reports, which, although dated prior to the time of the affidavit, may not have been typed. Even had the officer been aware of the reports, his misstatement that two persons had reported that Mr. Stallings was with Ms. Meredith the last time she was heard from, will not defeat probable cause. At least one person had reported that Ms. Meredith stated that Mr. Stallings was with her at that time. Nor do the police reports establish that Ms. Meredith was seen on Sunday. The police contacted residents who "had seen people earlier in the day coming in and out of the house." One neighbor reported a "lady" over at the Meredith house that Sunday, but the report did not identify the lady as Ms. Meredith. Moreover, the police reports contain information which would have strengthened probable cause had the information been included in the affidavit, including statements indicating that Ms. Meredith was very afraid of Mr. Stallings.

We find that the trial court did not abuse its discretion in declining to suppress the evidence seized as a result of the State's search warrant because there is no evidence

that Detective Wells acted knowingly and intentionally, or with reckless regard for the truth, when he included an inaccurate statement in the affidavit. Point V is denied.

Judgment is affirmed.

LOWENSTEIN and LAURA DENVIR STITH, concur.