**STATE of Missouri, Plaintiff–Respondent,**

v.

**Steven MORGAN, Defendant–Appellant.**

No. 25632.

Missouri Court of Appeals,
Southern District,
Division Two.

April 29, 2004.

Motion for Rehearing and Transfer
Denied May 21, 2004.

Irene Karns, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Office of Attorney General, Jefferson City, for Respondent.

KENNETH W. SHRUM, Judge.

A jury found Steven Morgan ("Defendant") guilty of second degree assault (§ 565.060) and burglary in the first degree (§ 569.160).[1] The trial court sentenced Defendant to consecutive seven-year prison terms for the two crimes. On appeal, Defendant raises three points of alleged reversible error relating to the admission of evidence, the prosecutor's closing argument, and the sufficiency of the evidence. Finding no merit to any of Defendant's claims, we affirm the judgment of convictions and sentences.

## FACTS

Because Defendant challenges the sufficiency of the evidence, we accept as true all the evidence favorable to the State, including all favorable inferences drawn from the evidence and disregard all evidence and inferences to the contrary. *State v. Skillicorn,* 944 S.W.2d 877, 894[33] (Mo.banc 1997). Defendant and Lisa Morgan ("Victim") had been married fifteen years when the couple separated in August of 2000. Thereon, Victim filed for divorce and sought refuge in a domestic violence shelter. Although their separation was triggered by Defendant's threats of violence to Victim, she quickly decided to get "back together for a few months." However, Victim again left the marital home in October.

During this period, Defendant began relationships with women via the Internet. Two of these women (Jonna Galvin and Melissa McCain) described Defendant as angry toward and obsessed with Victim. Sometime, in October or November of 2000, Victim moved into the same apartment complex as Galvin and McCain. This was an apparent coincidence.

Also during this period, near the end of September or early October, Defendant began a relationship with Margaret Sue Gordon ("Gordon") by answering her personal ad placed on the Internet. After numerous conversations via an Internet chat-room and the telephone, Gordon and Defendant arranged a face-to-face visit. After dining at a restaurant, the couple spent the evening in a motel room. On their second date, Defendant took Gordon on a drive around his hometown, showing her where Victim lived and where Victim's boyfriend lived. Throughout their brief courtship, Defendant spoke of his marital problems with Victim, stating the two "argued a lot." Defendant also told Gordon of the custody dispute between Victim and him regarding their child, Steven, Jr. Defendant "said that Steven was his life and that he wouldn't be able to bear losing him." On their third date, Defendant and Gordon sat at his home talking and drinking whiskey. Defendant became "aggravated and perturbed" as he drank increasingly more. Soon, Defendant devised a plan where Gordon was to hurt Victim. Defendant told Gordon to "knock on her door and act like [Gordon's] car was broken down." Then, Defendant wanted Gordon to strike Victim in the head with a "tire thumper."

The next day, Gordon followed through with the plan. Gordon gained access to Victim's home as instructed and struck Victim with the tire thumper at least twice. Victim retaliated, however. Victim finally subdued Gordon, and the police were called. When Gordon was arrested, she confessed that Defendant sent her to Victim's home to commit the assault. Thereafter, Gordon changed her story of the events several times to protect Defendant in hopes of continuing their romantic relationship. Finally, Gordon pled guilty to

---

**1.** All statutory references are to RSMo (2000), unless otherwise indicated.

the crime and told the police that Defendant was involved in planning the assault.

Defendant was arrested for his role in the assault and prosecuted upon an accomplice liability theory. Defendant's trial strategy was that Gordon "was a woman scorned" by Defendant and "a crazy liar, a fatal attraction woman from the Internet who was jealous of [Victim]." As previously stated, Defendant was convicted by the jury for second degree assault and burglary in the first degree. This appeal followed.

### Point I: Prior Bad Acts Evidence

■ In his first point on appeal, Defendant alleges the court committed reversible error when it allowed the State to present evidence of two prior acts showing Defendant's animosity toward Victim. The first incident was one where Defendant followed Victim in a rental car, forced her to pull over, and physically forced her window down. The second incident described was one when Defendant became angry and threw a remote control at Victim, cutting her lip. Defendant argues that this evidence only showed Defendant had a temper, not that he held any animosity toward Victim. In essence, Defendant claims this "bad character" evidence violated the principle that one's character cannot be used to show a propensity to commit the crime charged.

■ It is axiomatic that the "accused has the right to be tried only for the crimes with which he [or she] has been charged." *State v. Stallings*, 957 S.W.2d 383, 390[13] (Mo.App.1997). Consequently, evidence of prior bad acts or misconduct is inadmissible to show that an accused has a propensity to commit the charged crime. *State v. Tolliver*, 101 S.W.3d 313, 315[2] (Mo.App.2003). "Evidence of prior bad acts may be admissible, however, if it is logically relevant in that it has some tendency to establish directly the defendant's guilt of the charged crimes and if its probative value outweighs its prejudicial effect." *Id.* at 315[3].

■ When motive or intent is at issue in an assault case (as it is here), prior misconduct by the defendant is logically relevant to demonstrate such motive or intent. *Id.* at 315[4]. In such cases, Missouri courts typically admit prior uncharged misconduct as it is "commonly considered to be of such a degree of relevance as to outweigh the prejudicial effects." *State v. Smotherman*, 993 S.W.2d 525, 528 (Mo.App.1999); *see also State v. Williams*, 865 S.W.2d 794, 802 (Mo.App. 1993) and cases collected therein. We will not overturn the trial court's ruling on such evidence unless the court clearly abused its discretion. *Tolliver*, 101 S.W.3d at 315.

Here, the evidence clearly showed that Defendant was obsessed with his soon-to-be ex-wife. Other evidence that was admitted without objection revealed that Defendant was angry with Victim, he would do anything to keep custody of his child, and he had threatened Victim with violence in the past. Consequently, the two prior incidents of misconduct further showed Defendant's animosity toward Victim and his willingness to commit violence toward her. The court did not clearly abuse its discretion when it ruled the evidence was admissible. *Stallings*, 957 S.W.2d at 390–91; *Williams*, 865 S.W.2d at 802–04. Point denied.[2]

---

2. Defendant's point and argument are not models of clarity. He has presented other arguments that he fails to develop. For instance, he claims that the "remote control" incident was too remote in time to be relevant. Defendant utterly fails to recognize that remoteness goes to the weight of testimony, not to admissibility. *Smotherman*, 993

*Point II: Prosecutor's Closing Argument*

■ Defendant's second point maintains the trial court committed reversible error when it overruled his objection to a comment made by the prosecuting attorney during closing arguments. Defendant claims that the prosecutor improperly commented on his right not to testify. We disagree.

■ "The prosecutor may not comment adversely upon a defendant's failure to testify." *Stallings,* 957 S.W.2d at 392[24]. A "direct comment" upon the failure to testify, via use of words such as "defendant," "accused," and "testify," will many times require reversal. *Id.* at 392[25]. An "indirect comment" on the accused's right will not require reversal unless there was a calculated intent to magnify the defendant's choice not to testify so as to call the jury's attention to it. *State v. Elam,* 89 S.W.3d 517, 525 (Mo. App.2002). General comments concerning the rights of any defendant in a criminal trial and mere restatements of the law are not considered direct or indirect comments upon an accused's right not to testify. *State v. Barnum,* 14 S.W.3d 587, 592[15] (Mo.banc 2000).

The background to the comments at issue is the fact that a major issue in the case was Gordon's credibility. As recounted earlier, Gordon told varying stories to the authorities while incarcerated. During cross-examination of Gordon, Defendant's trial attorney impeached her on almost every point of her direct testimony. Defendant's trial counsel in closing argument repeatedly referred to Gordon as a crazy, obsessive liar. In his rebuttal to Defen-

dant's closing argument, the prosecutor admitted that Gordon was a liar, and he asked the jury to accept portions of her testimony and reject those parts that were obvious lies, stating "I think you have to weigh and look at what she says in light of all the other evidence to see if part of it is true and part of it isn't." In concluding his rebuttal, the prosecutor made the following comments:

"It seems that if the—that if the struggle of life on this planet is one of making order out of chaos, you know, we take raw materials and we make things and it takes a lot of energy, it takes a lot of time, takes a lot of intelligence; and you know what, I think our struggle—your struggle today will probably be no different. You have to make some order out of the chaos that is these—that these people have created. You have to decide the facts of this case, to determine truth. That's what you get to do, to determine what is true.

"This way we have, this whole trial of getting to the truth, has a long history. I picked up a book awhile back in our library. It's a dusty book, doesn't get used very much. I was flipping through it and found a chapter on the history of jury trials. This is what I learned. About 1,000 years ago, if someone was charged with a crime, he could clear himself by denying the charge under oath and by bringing in people called oath helpers, who in turn—"

Thereon, defense counsel objected, but the trial court overruled it. The prosecutor then continued:

---

S.W.2d at 528[8]. Another example of Defendant's shotgun approach to arguing this point lies in his undeveloped claim regarding the first incident. Inexplicably, he claims that forcing Victim off the road and forcing the window down was not evidence tending to show Defendant was violent toward Victim. Defendant claims this only showed he had a temper. This court believes that forcing someone off the road in a car is a violent act toward that person, and any argument to the contrary is simply frivolous.

"I'm saying that historically, 1,000 years ago, some could come in court, deny the charge, and they would have twelve oath helpers who would also swear out an oath, basically as to the character of the person. And you did that, you went free, okay. And the principle was a religious one. They couldn't conceive that anybody would take an oath and not be honest, not be truthful about it.

"Well, when they put it into place, into action, they realized that there were some shortcomings. First of all, they realized that not everybody was always honest, or some people couldn't find twelve people to give an oath. And if you didn't have that, then there was this awful deal called a trial by battle or trial by ordeal. And we know how that worked; they would either boil them, put them in water, you know, have wild animals, be put in a pit with wild animals. And if you survived, then again, it was a religious practice, the deity had proclaimed or confirmed your innocence.

"Well, people didn't like that either, it didn't work very well. So we have gradually evolved into this process where we bring in twelve people from the community and instead of picking an oath or verifying somebody's character, what we do is examine the evidence.

. . . .

"And so instead of twelve oath helpers, we have you." [3]

This verbatim account of the prosecutor's argument is set out to show the lack of merit to Defendant's argument. It is obvious to this court that the prosecutor was merely commenting on the history of how society and the justice system arrived at the truth. The focus was on the jury's role in discerning what was true and what was a lie. Before the jury was allowed to deliberate, it was instructed that Defendant had the absolute right not to testify, and that no adverse inference of guilt could be made by his choice not to testify. We cannot view the prosecutor's argument as either a direct or indirect comment on Defendant's failure to testify. The trial court did not err when it overruled Defendant's objection thereto. Point denied.

***Point III: Sufficiency of the Evidence***

In his final point on appeal, Defendant alleges that the evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt. Defendant claims that "the only direct evidence that he acted in concert with [Gordon] was her testimony, which did not constitute substantial, credible evidence." Defendant, however, acknowledges that witness credibility is a matter reserved for the jury. Even so, Defendant claims "the case at bar is exceptional." Without citation to any supporting authority or caselaw, he asks this court to reweigh the evidence and make a credibility determination. This we will not do.

An appellate court will not act as a super juror with veto powers. *State v. Clark*, 110 S.W.3d 396, 400[2] (Mo.App. 2003). We will not weigh the evidence, nor will we judge the credibility of the witnesses. *State v. Kellner*, 103 S.W.3d 363, 365 (Mo.App.2003). As the trier of fact, the jury is the sole arbiter of witness

3. "Trial by ordeal was condemned by the Pope in 1215...." GEORGE B. VOLD, ET AL., THEORETICAL CRIMINOLOGY, 5 (4th ed.1998). In its stead, the practice of compurgation arose in which the accused gathered a group of twelve reputable people who would swear that he or she was innocent. *Id.* This practice was common to the barbarian tribes which overran the Roman empire; therefore, the Church adopted it and the practice continued until 1833 when it was finally abolished. BLACK'S LAW DICTIONARY 282 (7th ed.1999).

credibility, and it is free to believe or disbelieve all, part, or none of any witness's testimony. *Id.*

We note that Gordon's testimony standing alone was sufficient for the jury to find guilt beyond a reasonable doubt. Other evidence was presented that tended to establish his guilt as well. We need not delve into such as Defendant's point merely asks this court to reweigh the evidence. The jury determined Gordon's credibility adversely to Defendant. We cannot upset this finding of fact on appeal. Point denied.

The judgment of convictions and sentences is affirmed.

RAHMEYER, C.J.–P.J., and BATES, J., concur.